**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ROBERT DUPEE, individually, and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | |
| *v.* | |
| PLAYTIKA SANTA MONICA, LLC a Nevada limited liability company, and CAESARS INTERACTIVE ENTERTAINMENT, INC., a Delaware corporation, | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Robert Dupee brings this Class Action Complaint and Demand for Jury Trial, individually and on behalf of all others similarly situated, against Defendants Playtika Santa Monica, LLC ("Playtika") and Caesars Interactive Entertainment ("Caesars") (together, "Defendants") to enjoin Defendants' operation of their unlawful gambling devices. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

### NATURE OF ACTION

1. Defendants operate a popular virtual casino under the name "Slotomania." In Slotomania, consumers are able to play a host of electronic slot machines. Slotomania is free to play on computers through, for example, Facebook.com and on mobile devices, such as Android smartphones and Apple iPhones.

2. Defendants provide first-time visitors of Slotomania a bundle of free "coins" that

can be used to wager on their virtual slots. After consumers inevitably lose their initial allotment of coins, Defendants attempt to sell them additional coins starting at $1.99 for 7,500 coins to $49.99 for 270,000 coins.

3.     Freshly topped off with additional coins, consumers wager to win more at Defendants' games. The coins won by consumers playing and winning Defendants' games of chance are identical to the coins that Defendants sell. Players that win big can also "cash out" by selling their accounts on the secondary market.

4.     By operating their virtual slots, Defendants have illegally profited from tens of thousands of consumers. Accordingly, Plaintiff Dupee, on his own behalf and on behalf of a Class and Subclass of similarly situated individuals, brings this lawsuit to recover his losses, as well as costs and attorneys' fees.

PARTIES

5.     Plaintiff Robert Dupee is a natural person and citizen of the State of Ohio.

6.     Defendant Playtika Santa Monica, LLC is a limited liability company incorporated and existing under the laws of the state of Nevada with its principle place of business at One Caesar's Palace Drive, Las Vegas, Nevada 89109. Playtika does business throughout the United States, the state of Ohio, and this District.

7.     Defendant Caesars Interactive Entertainment is a corporation organized and existing under the laws of Delaware with its principal place of business at One Caesars Palace Drive, Las Vegas, Nevada 89109. Caesars Interactive does business throughout the United States, the state of Ohio, and this District.

JURISDICTION AND VENUE

8.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

2

(a) at least one member of the class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

9.  The Court has personal jurisdiction over Defendants because Defendants conduct business in this District, and because the wrongful conduct occurred in this District.

10.  Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.  Free-to-Play and the New Era of Online Gambling**

11.  The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $1.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

12.  The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy

---

[1]  VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited May 21, 2015).

3

growth potential."[2]

13.    With free-to-play games of chance, developers have begun exploiting the same

psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily
> pay you for the crowbar to crack it open. The tremendous power of small
> random packs of goodies has long been known to the creators of physical
> collectible card games and companies that made football stickers a decade ago.
> For some … the allure of a closed box full of goodies is too powerful to resist.
> Whatever the worth of the randomised [sic] prizes inside, the offer of a free
> chest and the option to buy a key will make a small fortune out of these
> personalities. For those that like to gamble, these crates often offer a small
> chance of an ultra-rare item."[3]

14.    Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction
> to the games themselves; micro-transactions play to a different kind of addiction
> that has existed long before video games existed, more specifically, an addiction
> similar to that which you could develop in casinos and betting shops."[4]

15.    Recently, even the CEO of Caesars made similar observations in an

interview:

> "We didn't invent anything new. Our advantage is performance. We took games
> of chance and adapted them to the Facebook environment, and that's it.
> The same slot machine, the same poker, the same bingo – only on a social
> platform. We don't go far from the casino experience. It's a good subject.
>
> …

---

[2]    *Id.* Indeed, in 2011, Defendant Playtika—the company that launched Slotomania—was purchased by Defendant Caesars for between $80 and $90 million. *Playtika Acquired by Caesars Entertainment Casino Group for $80M to $90M | SocialTimes*, http://www.adweek.com/socialtimes/playtika-acquired-by-caesars-entertainment-casino-group-for-80m-to-90m/584058 (last visited May 21, 2015).

[3]    PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited May 21, 2015).

[4]    The Badger, *Are micro-transactions ruining video games? | The Badger*, http://www.badgeronline.co.uk/micro-transactions-ruining-video-games/(last visited May 21, 2015).

Some people have behavioral problems, which can be manifested by excessive shopping online, or by spending exorbitant amounts on Candy Crush or Slotomania – but they exist, it's part of the world. It's a small percentage and we're not seeking them out.

…

I'll explain it this way: You're at home and you've got four credit cards, each with a $10,000 spending cap. But you've only got $10,000 in the bank. Who's monitoring your spending on Amazon? No one. So it's easy to shop on Amazon until all your credit cards are maxed out, and suddenly you owe $40,000 to Amazon.

Is shopping addictive? Yes. Is there any way to control people's shopping on the Internet? Not really. A limited number of people have addictive personalities, and it's impossible to control this."[5]

16.     The comparison to land-based casinos doesn't end with addiction. Just as with casino operators, free-to-play developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[6]

17.     Academics have also studied the socioeconomic effect free-to-play games have on consumers. In one study, the authors compiled several sources analyzing free-to-play games of chance (called "casino" games below) and stated that:

"[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."

…

According to [another study], the purchase of virtual credits or virtual items

---

[5]     Asher Schecter, *Israeli social gaming power ready to make it in Las Vegas | Business |* Haaretz, http://www.haaretz.com/business/.premium-1.621092 (last visited May 21, 2015).
[6]     *Are micro-transactions ruining video games? | The Badger*, *supra*.

makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

18.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "[prior] research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer would transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

19.     The similarity between free-to-play games of chance and games of chance found in casinos has led governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants' Slotomania has thrived, and thousands of consumers have lost

---

[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8]     *Id.*

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Slotomania, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, http://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited May 21, 2015). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

millions of dollars unwittingly playing Defendants' unlawful games of chance.

## II.    A Brief Introduction to Defendants Playtika and Caesars.

20.    In December 2010, Defendant Playtika launched an online virtual casino called "Slotomania." In 2011, Playtika was purchased by Harrah's Casino for approximately $160 million.[10] Then, in series of mergers and acquisitions, Playtika and Slotomania were placed under the umbrella of Defendant Caesars Interactive Entertainment, Inc.—one of the largest online, mobile and social gaming companies with long ties to traditional casino gaming.[11]

21.    Slotomania is available for consumers to play through numerous websites such as Facebook, and on mobile devices such as Android phones and Apple iPhones. Slotomania is very profitable. In 2014 alone, Slotomania generated almost $280 million in revenue[12] and has been Caesars' most successful and profitable game, accounting for 47.7% of its total revenue. Unfortunately, and as explained further below, Defendants' Slotomania generates such profits because it is an unlawful virtual casino filled with illegal games of chance.

## III.    Defendants' Virtual Casino Contains Unlawful Games of Chance.

22.    Consumers visiting Defendants' virtual casino for the first time are awarded ten thousand free "coins," Defendants' virtual currency for Slotomania. Ostensibly, Defendants give away these coins to each consumer to ensure that they "buy in" to Defendants' casino over alternatives.

23.    After they begin playing, consumers quickly lose their initial allotment of coins.

---

[10]    *International Game Technology to Acquire Social Gaming Company Double Down Interactive | IGT News Room*, http://www.igt.com/company-information/news-room/news-releases.aspx?NewsID=1647893 (last visited May 21, 2015).

[11]    *Id.*

[12]    Caesars Acquisition Company, *Form 10-K*, at 27, 53, http://files.shareholder.com/downloads/AMDA-26XRVU/108250871x0x816171/7DEB3AB6-64B5-46D9-80CC-FAE83E09DC48/CACQ-2014_Q4_Form_10-K.PDF (last visited May 21, 2015).

Immediately thereafter, Defendants inform them via a "pop up" screen that "YOU'RE OUT OF COINS," and prevent them from additional play. *See* <u>Figure 1</u>. Defendants tell consumers that to "keep the fun going" they have to "BUY COINS." *See* <u>*Id.*</u>



(**<u>Figure 1.</u>**)

24.    When the player clicks "BUY COINS," Defendants cause Slotomania to take the player their coin store, where Defendants sell coins starting at prices of $1.99 for 7,500 coins to $49.00 for 270,000 coins. *See* <u>Figure 2</u>.



(**<u>Figure 2</u>**, showing Defendants' online store where they sells coins for cash.)

25.    The decision to sell coins by the thousands isn't an accident. Rather, Defendants attempt to lower the perceived cost of the coins (costing just a fraction of a penny per coin) while

simultaneously maximizing the perceived value of the award (awarding millions of coins in jackpots), further inducing consumers to bet on their games.

26.     To begin wagering, players select the "total bet" used for a spin, as illustrated in Figure 3. Defendants designed Slotomania to allow consumers to alter the Total Bet by selecting the number of "lines" (*i.e.*, combinations) on which the consumer can win and the "bet" per line. *See id.*



(**Figure 3.**)

27.     The bet amount multiplied by the number of lines comprises the "total bet." In the example shown in Figure 3, the player is attempting to bet 50 coins on 50 lines for a total bet of 2,500 coins (approximately $0.66) for one spin of the slot machine.

28.     Once a consumer spins the slot machine by pressing the "SPIN!" button (shown in Figure 3), Slotomania does not allow (or call for) any additional user action. Instead, the consumer's computer or mobile device communicates with and sends information (such as the total bet amount) to Defendants' servers. Defendants' servers then execute the game's algorithms that determine the game's outcome. Notably, none of Defendants' games depend on any amount of skill to determine their outcomes—all outcomes are based entirely on chance (*i.e.*, random outcomes generated by Defendants' algorithms).

29.     Figure 4 shows an outcome advertised by Defendants where a 100,000-coin bet (approximately worth $22) won the player 10,000,000 coins. Absent the win, the 10,000,000 coins would have cost the player approximately $1,849.63 to buy. Now, however, the newly won coins provide the player with one hundred additional free plays at the 100,000-coins bet level and add value to the payer's Slotomania account.



(**Figure 4.**)

30.     Consumers can continue playing with the coins that they won, or they can exit the game and return at a later time to play because Defendants maintain win and loss records and account balances for each consumer. Indeed, once Defendants' algorithms determine the outcome of a spin and Defendants display the outcome to the consumer, Defendants adjust the consumer's account balance. Defendants keep records of each wager, outcome, win, and loss for every Slotomania player.

31.     Slotomania is also connected to the Total Rewards program used by Defendants' related casino entities, including Caesars and Harrah's casinos.[13] Consumers receive "TR Reward Credits" when they play Slotomania and make qualifying purchases and can redeem the credits for hotel rooms, food, entertainment tickets, and retail goods at casinos around the world, and for items found in the "Total Rewards catalog." (*See* Figures 5 and 6.)

---

[13]     *Total Rewards*, https://www.totalrewards.com/content/cet-tr/en.html (last visited May 21, 2015).



(**Figure 5.**)



(**Figure 6**, showing Apple iPhone 5s available for 122,000 Reward Credits.)

32.     And for consumers that win big, they cash out by selling their coin-laden accounts on the secondary market.[14] For example, one player offered to pay $500 for a Slotomania

---

[14]     *Why cant i buy coins for slotomania? - Page says loading but does nothing else :: Ask Me Fast*, http://www.askmefast.com/Why_cant_i_buy_coins_for_slotomania-qna2172335.html (last visited May 21, 2015); *see also Selling stomania coins (account) - Slotomania Slot Machines*, http://gamesdreams.com/showthread.php?470958-Selling-stomania-coins-(account) (last visited May 21, 2015) (selling account).

account with millions of coins.[15] In another case, a player sold their Slotomania account for approximately $530.[16]

## FACTS SPECIFIC TO PLAINTIFF DUPEE

33.     In or around June 2014, Plaintiff Dupee began playing Slotomania on his computer at the website www.slotomania.com. During his first visit, Defendants provided Plaintiff with several thousand free coins. After Plaintiff lost the balance of his initial allocation of free coins, however, Plaintiff Dupee began purchasing coins from Defendants.

34.     Thereafter, Plaintiff Dupee continued playing Slotomania by wagering purchased coins for the chance of winning additional coins. From June 2014 to April 2015, Plaintiff Dupee wagered and lost (and Defendants won) over $12,000 by playing Slotomania.

## CLASS ALLEGATIONS

35.     **Class Definition:** Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a Class and Subclass of similarly situated individuals, defined as follows:

> **Class:** All persons in the United States who lost purchased coins by wagering at Defendants' Slotomania.

> **Subclass:** All Class members domiciled in the State of Ohio.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who

---

[15]     *Why cant i buy coins for slotomania? - Page says loading but does nothing else :: Ask Me Fast, supra.*
[16]     *Slotomania Facebook Spiel*, http://www.ebay.com/itm/221654951330 (last visited May 21, 2015).

properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

36.     **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class and Subclass. Members of the Class and Subclass can be identified through Defendants' records, discovery, and other third-party sources.

37.     **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

> (a)     Whether Defendants engaged in deceptive trade practices by operating unlicensed games of chance;
>
> (b)     Whether Defendants' virtual casino games in Slotomania are unlawful "slot machines" as defined by Ohio Rev. Code § 3772.01;
>
> (c)     Whether Plaintiff and members of the Subclass lost by gambling any sum of money or thing of value to Defendants;
>
> (d)     Whether Defendants are a "winner" of Plaintiff Dupee's and the Subclass's monies or things of value; and
>
> (e)     Whether Defendants have unjustly received money belonging to Plaintiff and the Class, and whether, under principles of equity and good conscience, Defendants should not be permitted to retain it.

38.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the

Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendants' wrongful conduct.

39.  **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing Defendants' games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

40.  **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same.

41.  **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress

14

Defendants' wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

42.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
**Violation of the Nevada Deceptive Trade Practices Act
Nevada Rev. Stat. § 41.600(2)(e)
(On Behalf of Plaintiff and the Class)**

43.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

44.     In the course of their business, Defendants have engaged in consumer fraud because they engaged in a deceptive trade practices as defined in Nevada Revised Statutes Section 5908.0923.

45.     Defendants knowingly (1) conducted business without all required state licenses, Nev. Rev. Stat. § 5908.0923(1) and (2) violated a state statute or regulating relating to the sale or lease of goods or services, *see* Nev. Rev. Stat. § 5908.0923(3), because at no time has Defendants' Slotomania been licensed by the Nevada State Gaming Control Board or any other Nevada agency.

46.     Under Nevada Revised Statutes Section 463.160, "it is unlawful for any person, either as owner, lessee or employee … (f) To operate, carry on, conduct, maintain or expose for play in or from the State of Nevada any interactive gaming system, without having first procured, and thereafter maintaining in effect, all federal, state, county and municipal gaming licenses as required by statute, regulation or ordinance or by the governing board of any unincorporated town."

47.     The Nevada State Gaming Control Board has defined an "Interactive Gaming System" as "a gaming device and means the collective hardware, software, communications technology, and proprietary hardware and software specifically designed or modified for, and intended for use in, the conduct of interactive gaming. The core components of an interactive gaming system, including servers and databases running the games on the interactive gaming system and storing game and interactive gaming account information, must be located in the State of Nevada except as otherwise permitted by the chairman or his designee." Regulations of the Nevada Gaming Commission and State Gaming Control Board Regulation 14 14.010 (15).

48.     Defendants' Slotomania is "Interactive Gaming" because it uses the internet to let consumers place bets or wagers in a gambling game and display information related to the game and game outcome. *See* Nev. Rev. Stat. § 463.016425.

49.     Accordingly, Defendants are required to license Slotomania because it is an Interactive Game and an Interactive Gaming System. Defendants have not obtained required licenses for Slotomania and are, thus, in violation of Nevada Revised Statutes Section 463.160 and have engaged in deceptive trade practices. *See* Nev. Rev. Stat. § 5908.0923(1) and (3).

50.     As a result of Defendants' deceptive trade practices, Plaintiff and the members of the Class have suffered actual damages by purchasing coins that were then wagered at

16

Defendants' unlawful gambling games. Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

51.     Plaintiff, on behalf of himself and the Class, seeks an order: (i) permanently enjoining Defendants from engaging in the deceptive conduct described herein; (ii) awarding all damages Plaintiff and members of the Class sustained, (iii) requiring Defendants to pay reasonable costs and attorneys' fees; and (iv) further relief to be specified at trial.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

52.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

53.     Plaintiff and the Class have conferred a benefit upon Defendants in the form of the money Defendants received from them for the purchase of coins to wager in Defendants' Slotomania.

54.     Defendants appreciate and/or have knowledge of the benefits conferred upon them by Plaintiff and the Class.

55.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendants have unjustly obtained as a result of their unlawful operation of casino games. As it stands, Defendants have retained millions of dollars in profits generated from their unlawful games of chance and should not be permitted to retain those ill-gotten profits.

56.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

<u>**COUNT III**</u>
**The Ohio Loss Recovery Statute**
**(Ohio Rev. Code § 3763.02)**
**(On Behalf of Plaintiff and the Subclass)**

57.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

58.     Plaintiff Dupee and members of the Subclass are all "persons" within the meaning of Ohio Rev. Code § 3763.02.

59.     Plaintiff Dupee and each member of the Subclass lost money to Defendants by playing Slotomania whereby they wagered coins (which were purchased for cash) for the chance of winning additional coins.

60.     Slotomania is a "game" as contemplated by Ohio Rev. Code § 3763.02 because it is contains unlawful "slot machines" as defined by Ohio Rev. Code § 3772.01. Specifically, Defendants' games within Slotomania are electronic (*i.e.*, "electrical") devices that begin operation upon the virtual insertion of a coin and make play available. Further, the games make individual prize determinations entirely based on chance. The prizes Defendants' Slotomania games pay out are additional coins, which are tokens and/or things of value.

61.     As described in <u>Section III</u>, above, Defendants designed Slotomania to encourage players to wager coins for a chance to win additional coins, which are things of value. Moreover, Defendants designed the slot games featured in Slotomania so that a press of the "spin" buttons causes coins (which were purchased by Plaintiff and the members of the Subclass with real money from Defendants in their coin store) to be debited from consumers' accounts.

62.     Defendants' Slotomania coins are things of value because Defendants sell millions of dollars of coins each year, Defendants award coins and grant additional free plays of slot games (which would otherwise cost money), and/or consumers can sell coins on the

secondary market. *See* <u>Section III</u>.

63.     Defendants' virtual slot games featured in Slotomania are games of chance because a "spin" (or other similar function) results in the award of things of value based upon pre-determined odds of winning. Defendants programmed their slot games to award a varying number of coins (or no coins at all) based upon a pre-programmed algorithm that determines the likelihood of winning based on the use of random number generators (*i.e.*, chance). After a consumer presses the "spin" button, Defendants do not take or require any input from the consumer to award the prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendants' virtual slot games are not contests of skill, and, thus, cannot be (and are not) skill-based amusement machines.

64.     Plaintiff Dupee and each member of the Subclass are all "losers" (*i.e.*, they "by a wager, lost to another") because they each purchased and then wagered coins playing at Defendants' virtual slot games found within Slotomania. In addition, Plaintiff Dupee and the members of the Subclass had the value of their wagers deducted from their accounts concurrently with a spin.

65.     Defendants are the "winners" of Plaintiff's and the Subclass's losses because they participate in the games of chance and have direct stakes in the outcome of the gambling. Specifically, Defendants developed Slotomania, programmed the functionality for each of their virtual slot games (including the algorithms that determine the chance of winning coins), provide access to the virtual slot games, and obtain all of the money consumers lose wagering at their games of chance.

66.     Plaintiff Dupee and the members of the Subclass delivered coins and money to Defendants through Slotomania. That is, Defendants authored an electronic method of

converting money to coins and programmed Slotomania to deduct coins from Plaintiff's and the members of the Subclass's accounts concurrently with a spin.

67.     Plaintiff Dupee's and each Subclass member's losses occurred in Ohio because Defendants' Slotomania virtual slot games operate on computers (*i.e.,* within browser windows on a home PC) and devices (*e.g.*, on iPhone and Android devices) within the State of Ohio. As such, Defendants have caused such devices in Ohio to operate as discrete terminals for their gambling devices.

68.     As a direct and proximate result of Defendants' operation of the gambling devices, Plaintiff Dupee and each member of the Subclass have lost monies to Defendants. Plaintiff Dupee, on behalf of himself and the Subclass, seeks an order (1) requiring Defendants to cease the operation of their gambling devices, and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dupee, on behalf of himself and members of the Class, prays for the following relief:

a.     Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Robert Dupee as Class representative and his undersigned attorneys as Class Counsel;

b.     Enter judgment against Defendants, in the amount of the losses suffered by Plaintiff Dupee and each member of the Subclass;

c.     Award Plaintiff and the members of the Class reasonable costs and attorneys' fees;

d.     Award Plaintiff and the members of the Class pre- and post-judgment interest;

e.      Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to

protect the interests of Plaintiff and the members of the Class; and

f.      Award such other and further relief as equity and justice may require.

### JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,

**COHEN ROSENTHAL & KRAMER LLP**

Dated: May 21, 2015

/s/ Jason R. Bristol
Jason R. Bristol (0072989)
jbristol@crklaw.com
Joshua B. Fuchs (0087066)
jfuchs@crklaw.com
Joshua R. Cohen (0032368)
jcohen@crklaw.com
The Hoyt Block Building – Suite 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
216-781-7956 [Telephone]
216-781-8061 [Facsimile]

Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin H. Richman*
brichman@edelson.com
Courtney C. Booth*
cbooth@edelson.com
Amir C. Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro Hac Vice Application Forthcoming*