**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ROBERT DUPEE, individually, and on behalf of all others similarly situated,<br><br>   *Plaintiff*,<br><br>  *v.*<br><br>PLAYTIKA SANTA MONICA, LLC a Nevada limited liability company, and CAESARS INTERACTIVE ENTERTAINMENT, INC., a Delaware corporation,<br><br>   *Defendants*. | Case No. 15-cv-01021<br><br>Honorable Christopher A. Boyko |

**PLAINTIFF DUPEE'S OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................3

ARGUMENT ...........................................................................................................4

I.      LEGAL STANDARD ...................................................................................4

II.     THIS COURT IS THE APPROPRIATE FORUM FOR RESOLVING
PLAINTIFF'S CLAIMS ..............................................................................5

        A.     The Court has Personal Jurisdiction Over Defendants, Which are
Responsible for the Operation and Maintenance of *Slotomania* ...............5

        B.     Playtika Israel's Terms of Service Do Not Apply and Cannot Be
Considered ...........................................................................................8

               i.     *The Playtika Israel Terms are outside of the Pleadings and may
not be Considered.* ..........................................................................8

               ii.    *Enforcement of the Terms' Israel Forum Selection Clause
would Unfairly Prejudice Plaintiff and the Class* ...........................9

               iii.   *If the Court is inclined to Consider the Playtika Israel Terms,
Plaintiff Should be Granted Leave to Take Limited Discovery
Regarding their Applicability to his Claims, and Defendants'
and Playtika Israel's Respective Involvement in the
Maintenance and Operation of Slotomania prior to a
ruling on Defendants' Motion* ........................................................11

III.    PLAINTIFF PROPERLY PLED CLAIMS FOR VIOLATION
OF THE NDTPA, VIOLATION OF THE OLRS, AND UNJUST
ENRICHMENT ..........................................................................................13

        A.     Plaintiff States a Valid Claim Under the NDTPA ...................................13

               i.     *Plaintiff Properly Brings His Claim Pursuant to
Nevada Law* ...................................................................................13

               ii.    *The Most Significant Relationship Test Requires
Application of Nevada Law* ............................................................15

               iii.   *Defendants' Operation of Slotomania Violates the NDTPA* ..........16

a.     Defendants' Operation of *Slotomania* Constitutes "Interactive Gaming" ........................................................17

b.     *Slotomania* is a "Gambling Game" .................................19

B.     Plaintiff Has Stated a Valid Claim Under the Ohio Loss Recovery Statute ........................................................................20

i.     *Plaintiff Sufficiently Pleads the Elements of His OLRS Claim* ......20

a.     *Slotomania* is an Unlawful Game of Chance ...................21

1.     Plaintiff and the Putative Class Gave Something of Value to Play *Slotomania* ...............22

2.     *Slotomania* Players Have a Hope of Gain.............23

3.     *Slotomania* is a "Game of Chance" ......................24

ii.     *Defendants Stand to Win and Plaintiff and the Class Stand to Lose* ......................................................................... 25

iii.     *Dupee Alleged His and the Class's Losses with the Requisite Specificity* ........................................................28

C.     Plaintiff Sufficiently Pleaded His Claim for Unjust Enrichment.............29

CONCLUSION ..................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases:**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................5

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ................................................8

**United States Circuit Court of Appeals Cases:**

*Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499 (6th Cir. 2014).......................6

*Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425 (6th Cir. 2006) ...............11

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ...............................11, 29

*Conn v. Zakharov,* 667 F.3d 705 (6th Cir. 2012).........................................................5

*Directv, Inc. v. Treesh*, 487 F.3d 471 (6th Cir. 2007).................................................5

*Intera Corp. v. Henderson*, 428 F.3d 605 (6th Cir. 2005) ...........................................11

*Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999)........................................8, 9

*Serras v. First Tenn. Bank Nat'l Ass'n.*, 875 F.2d 1212 (6th Cir. 1989) ........................11

*Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446 (3d Cir. 2003).........................11, 12

*Wong v. PartyGaming  Ltd.*, 589 F.3d 821 (6th Cir. 2009) ....................................10,11

**United States District Court Cases:**

*Asp v. Toshiba Am. Consumer Products, LLC*, 616 F. Supp. 2d 721 (S.D. Ohio 2008) ...............9

*C. Thorrez Industries, Inc. v. LuK Transmissions Systems, LLC*,
No. 09-cv-01986, 2010 WL 1434326 (N.D. Ohio Apr. 8, 2010) .................................9, 10

*Carr v. DJO Inc.*, No. 12-cv-42, 2012 WL 3257666 (S.D. Ohio Aug. 8, 2012) ....................11, 12

*Del Webb Communities, Inc. v. Partington*,
No. 08-cv-00571, 2009 WL 3053709 (D. Nev. Sept. 18, 2009).........................................18

*Farhner v. Tiltware LLC*, No. 13-cv-0227, 2015 WL 1379347 (S.D. Ill. Mar. 24, 2015) ...........28

*Floyd v. Bank of Am., N.A.*,
No. 13-cv-2072, 2014 WL 3732591 (N.D. Ohio July 25, 2014)........................................8

*Goldberg v. Cent. Credit Mgmt., Inc.*,
No. 11-cv-00305, 2012 WL 6042194 (D. Nev. Dec. 3, 2012) ........................................14

*Hale v. Enerco Grp., Inc.*, 288 F.R.D. 139 (N.D. Ohio 2012)........................................15

*Humphrey v. Viacom, Inc.*, No. 06-cv-2768, 2007 WL 1797648 (D.N.J. June 2, 2007)..............28

*In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198 (S.D.N.Y. 2012)...........13

*Irondale Indus. Contractors, Inc. v. Virginia Sur. Co.*,
754 F. Supp. 2d 927 (N.D. Ohio 2010)...............................................................15

*Johnson v. Triple Leaf Tea Inc.*,
No. 14–cv–01570, 2014 WL 4744558 (N.D. Cal. Sept. 23, 2014)....................................14

*Kinder v. City of Myrtle Beach*,
No. 11-cv-712, 2015 WL 1439136 (S.D. Ohio Mar. 27, 2015)........................................6

*Langone v. Kaiser*,
No. 12-cv-2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013) ........................................28

*Lemkin v. Bell's Precision Grinding*,
No. 08-cv-789, 2009 WL 1542731 (S.D. Ohio June 2, 2009)...........................................12

*Lyman Steel Corp. v. Ferrostaal Metals Corp.*, 747 F.Supp. 389 (N.D.Ohio 1990)...................10

*Metz v. Unizan Bank*, No. 05-cv-1510, 2007 WL 3232431 (N.D. Ohio Oct. 31, 2007) ...............8

*Mulch Mfg., Inc. v. Advanced Polymer Solutions, LLC*,
947 F.Supp.2d 841 (S.D. Ohio 2013) ...............................................................15

*MV Circuit Design, Inc. v. Omnicell, Inc.*,
No. 14-cv-2028, 2015 WL 1321743 (N.D. Ohio Mar. 24, 2015)......................................15

*Patel v. Dish Network L.L.C.*,
No. 12-cv-1078, 2015 WL 4776894 (S.D. Ohio Aug. 12, 2015) .....................................30

*Peterson v. Graoch Assoc. No. 111 Ltd. Partnership*,
No. 11-cv-5069, 2012 WL 254264 (W.D. Wash. Jan. 26, 2012) .....................................14

*Phillips v. Dignified Transition Solutions, LLC, et al.*, No. 13-cv-02237 (D. Nev.)...................14

*Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651 (D. Nev. 2009) ....................................................14

*Projects Unlimited, Inc. v. All Tech Electronics, Inc.*,
  No. 09-cv-284, 2010 WL 299156 (S.D. Ohio Jan. 21, 2010) ...............................................6

*Risinger v. SOC LLC*, 936 F. Supp. 2d 1235 (D. Nev. 2013) ........................................................14

*Robins v. Global Fitness Holdings, LLC*, 838 F.Supp.2d 631 (N.D. Ohio 2012) ..........................8

*Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877 (N.D. Ohio 2010) ...............7

*Sonnenberg v. Oldford Group, Ltd.*,
  No. 13-cv-03444, 2015 WL 1379505 (S.D. Ill. Mar. 24, 2015) .......................................28

*Traton News, LLC v. Traton Corp.*, 914 F.Supp.2d 901 (S.D. Ohio 2012) ...................................9

*Victoria's Secret Stores Brand Mgmt., Inc. v. Bob's Stores LLC*,
  No. 13-cv-1261, 2014 WL 1045994 (S.D. Ohio Mar. 17, 2014) ...............................12,13

## State Court Cases:

*Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100 (2005) ..................................................14

*Bedford v. Doerner,* 2013-Ohio-1798 (Ohio App. Ct. May 2, 2013) ..........................................23

*Brown v. Eddie World, Inc.*, 348 P.3d 1002 (Nev. 2015) .............................................................16

*City of Akron v. Castle Aviation Inc.*,
  No. 16057, 1993 WL 191966 (Ohio Ct. App. June 9, 1993)...........................................10

*City of Columbus v. Gutter*,
  No. 80AP-925, 1981 WL 3058 (Ohio Ct. App. Mar. 12, 1981) .......................................27

*Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179 (1984) ..................................................29, 30

*Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73 (1990) ....................6

*Kraus v. City of Cleveland*, 135 Ohio St. 43 (1939) ..............................................................23, 24

*McDougal v. State*, 324 Ark. 354 (1996) ....................................................................................27

*Myers v. City of Cincinnati*, 128 Ohio St. 235 (1934) .................................................................24

*Ohio Vending Operators Group v. Dept. of Liquor Control*,
  No. 87AP-64, 1987 WL 15672 (Ohio Ct. App. Aug. 13, 1987)............................21, 23, 25

*Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915 (Ill. App. Ct. 5th Dist. 2010)...................28

*Sacco v. State*, 105 Nev. 844 (1989) ........................................................................................16

*Salamon v. Taft Broadcasting Co.*, 16 Ohio App.3d 336 (Ohio Ct. App. April 18, 1984) ..........29

*San Allen, Inc. v. Buehrer,* 2014-Ohio-2071 (Ohio Ct. App. May 15, 2014)...............................30

*Schaste Metals, Inc. v. Tech Heating & Air Conditioning, Inc.*,
    No. 71589, 1997 WL 449989 (Ohio Ct. App. Aug. 7, 1997) ..........................................30

*State v. Brown*, 116 Ohio App.3d 389 (2nd Dist.1996)......................................................*Passim*

*State ex rel. Commt. for the Refer. of Lorain Ord. No. 77-01 v. Lorain Cty. Bd. of Elections*,
    2002-Ohio-4194 (2002) ....................................................................................................30

*State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 1998-Ohio-380 (1998).................................30

*Stillmaker v. Dept. of Liquor Control*, 18 Ohio St.2d 200 (1969) .........................................22, 23

*Westerhaus Co. v. City of Cincinnati*, 165 Ohio St. 327 (1956)................................................23

*Wiley v. Wiley*, 2007-Ohio-6423 (Ohio Ct. App. Dec. 3, 2007) .................................................30

*Wiltsie v. Baby Grand Corp.*, 105 Nev. 291 (1989) .................................................................16

**Miscellaneous:**

Caesars Acquisition Company 10-K, *available at*
    http://investor.caesarsacquisitioncompa ny.com/secfiling.cfm?filingID=
        1575879-15-9&CIK=1575879................................................................*Passim*

Churchill Downs 10-K, *available at*
    http://ir.churchilldownsincorporated.com/secfiling.cfm?filingID =20212-15-11 ...........27

Fed. R. Civ. P. 12 .................................................................................................4, 6, 8

N.R.S. 41.600................................................................................................*Passim*

N.R.S. 463.0152...............................................................................................19

N.R.S. 463.016425............................................................................................17, 18

N.R.S. 463.160................................................................................................17, 18

N.R.S. 598.0923...............................................................................................17, 18

NV GAM REG 14.010 ........................................................................................17, 18

Playtika Santa Monica LinkedIn, *available at*
    https://www.linkedin.com/ company/ buffalo-studios (last visited Sept. 1, 2015).............7

R.C. § 2307.382 ..................................................................................................5–6

R.C. § 2915.01 ................................................................................................ *passim*

R.C. § 2915.02 ........................................................................................................20

R.C. § 3763.01 ..................................................................................................20, 26

R.C. § 3763.02 .................................................................................................*Passim*

R.C. § 3763.03 ........................................................................................................28

R.C. § 3763.04 ........................................................................................................29

R.C. § 3772.01 ........................................................................................................20

## INTRODUCTION

Defendants Caesars Interactive Entertainment, Inc., and Playtika Santa Monica, LLC (respectively "Caesars" and "Playtika SM," collectively "Defendants") own and operate the wildly popular and profitable virtual slot application aptly-named "*Slotomania*," which allows users to play numerous slot machines through their mobile devices, Facebook, and the *Slotomania* website. In order to play, users purchase "Coins" from Caesars and wager through Defendants' numerous electronic slot machines in hopes of receiving additional Coins that can either be used to extend gameplay within *Slotomania* or be sold for actual currency on secondary markets. It turns out, however, that this seemingly benign game of chance actually constitutes unlawful gambling equipment under the laws of Ohio and Nevada, thus entitling players of the game to recoup the monies they have lost playing and to other relief.

Plaintiff Robert Dupee ("Dupee" or "Plaintiff") is one such consumer that fell victim to Defendants' unlawful slot machines, losing more than $12,000 to Defendants. In response, Dupee brought the instant action on behalf of himself and a class of similarly situated individuals (the "Class") in an effort to recoup funds that were unlawfully obtained by Defendants as a result of their alleged conduct. In his Complaint, Dupee alleges three causes of action: (1) violations of the Nevada Deceptive Trade Practices Act, Nevada Rev. Stat. § 41.600(2)(e) ("NDTPA"), (2) violations of the Ohio Loss Recovery Statute, Ohio Rev. Code § 3763.02 ("OLRS"), and (3) unjust enrichment. Defendants now seek dismissal of each of Plaintiff's claims, raising a handful of ultimately unavailing arguments.[1]

---

[1]    Defendants have previously moved this Court, without opposition from Plaintiff, for assignment of these proceedings to the complex case track. (Dkt. 5.) Consistent with that request, Defendants filed a memorandum of law in support their motion to dismiss pursuant to the thirty-page limit set forth under the briefing requirements for cases in the complex track. (*See* dkts. 6, 10); *see also* L.R. 7.1(f). Accordingly, Plaintiff similarly submits the instant brief with thirty pages of substance and consistent with the complex track briefing requirements.

Defendants' motion to dismiss ("Mot.") is based primarily upon the mistaken premise that they—Caesars and Playtika SM—do not operate or control *Slotomania*. Rather, Defendants' argue that Playtika Ltd. ("Playtika Israel"), a wholly owned subsidiary of Caesars that operates out of Israel, controls *Slotomania*, and that as a result Defendants are themselves insulated from liability.[2] In reality, Caesars' own financial reporting clearly indicates that it controls both the finances of Playtika Israel as well as *Slotomania* itself and therefore, is properly before this Court as a party-defendant.

Defendants' next argument is much the same. They contend that the NDTPA does not apply because the conduct in question had no connection to Nevada inasmuch as Playtika Israel is supposedly responsible for the control and operation of *Slotomania* and the statute cannot apply extraterritorially. But these arguments fail to acknowledge the factual bases of Dupee's claims—namely, that despite their protests, both named-Defendants are in fact responsible for the unlawful gambling at issue and because they also maintain their principal places of business within Nevada, the NDTPA may appropriately be applied to them.

Defendants next argue that Dupee also fails to state a claim under the Ohio Loss Recovery Act. In particular, they argue that (1) *Slotomania* is not an illegal game of chance under Ohio law, (2) neither Defendants nor Plaintiff were winners or losers as required by the OLRS, and (3) Plaintiff has failed to plead his claims with the requisite specificity. Those arguments miss their mark as well. Ohio law defines a "game of chance" as any "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance[.]" R.C. 2915.01. Plaintiff has alleged that

---

[2]       Defendants attempt to introduce Playtika Israel into the litigation by attaching various documents that are outside of the pleadings to their Motion to Dismiss—e.g., the Terms of Service from Playtika Israel's website. (*See* Dkt. 10-2.) However, and as discussed below, Defendants' attempts to introduce these documents are improper at the motion to dismiss stage. Notwithstanding, the documents have no bearing on the sufficiency of Plaintiff's allegations.

*Slotomania* is just that—that it allowed Plaintiff to wager a thing of value ("Coins") in order to win "Coins" or additional gameplay from Defendants or, in the alternative, to lose Coins to Defendants on every spin. Nothing more need be pleaded. And, Plaintiff's claims are not subject to the OLRS's heightened pleading requirements because he does seek to recover the *losses of a third-party*, but rather, to recover the monies that he personally lost to Defendants.

Finally, Defendants' bid for dismissal of Plaintiff's unjust enrichment claim fails for similar reasons. Having sufficiently pleaded a claim for illegal gambling under both Ohio and Nevada law, Plaintiff has also sufficiently alleged that he and the putative class conferred a benefit upon Defendants in the form of the monies they paid (and lost) in *Slotomania*, and that Defendants' retention of those monies would be unjust given their unlawful conduct. Further, the idea that Defendants did not *directly* benefit from Plaintiff and the class is belied by their own public representations to the contrary—e.g., in their financial statements.

For these reasons and as explained further below, Defendants' motion to dismiss should be denied in its entirety.

## **FACTUAL BACKGROUND**

Defendants Caesars and Playtika SM operate the popular *Slotomania* videogame, a casino style game designed to appeal to a mass audience of "casual gamers." (*See* Class Action Complaint and Jury Demand, Dkt. 1 ["Compl."] ¶¶ 11–32.) Casual gamers are enticed by the "free-to-play" model of games such as *Slotomania*: users are encouraged to download the game for free and prompted to buy many low-cost items (most often, Coins) within the game while playing. (*Id*. ¶¶ 11–12.) Over time, these games may influence addiction, specifically psychological triggers similar to gambling addiction. (*Id*. ¶¶ 13–15.) Notably, none of these

games are games of skill; rather, they are games of chance because the outcomes of the games are entirely determined by the Defendants' computerized algorithms. (*Id*. ¶ 28.)

The *Slotomania* virtual slot machine is one such game owned, maintained, and operated by Defendants and available for play on Android and Apple iOS devices, Facebook, and web browsers. (*Id*. ¶¶ 1–2.) New users are initially given a bundle of free Coins to play the slots, a cache that inevitably runs out. (*Id*. ¶¶ 2–3.) After users have run out of this initial allotment, Defendants offer additional Coins at a price—starting at $1.99 for 7,500 Coins—to allow them to play more slots. (*Id*.) The game of chance rewards winners with more Coins; thus, because Coins are required to play *Slotomania*, the reward of additional Coins is also the reward of additional plays. (*Id*. ¶ 3.) Moreover, when players win or buy large amounts of Coins, instead of using them for additional plays, they may "cash out" by selling their Coins to other *Slotomania* players on an active secondary market. (*Id*. ¶¶ 3, 32.)

Plaintiff Dupee is one such player of *Slotomania* who, like thousands of others, lost money to Defendants' unlawful gambling operation. (*Id*. ¶¶ 33–34.) In particular, in or around June 2014, Plaintiff Dupee began playing *Slotomania* on his personal computer. (*Id*.) Like many others, he purchased Coins from Defendants to continue playing after he lost his initial allotment. (*Id*.) In total, Plaintiff purchased and lost more than $12,000 worth of Coins playing *Slotomania*. (*Id*.)

## ARGUMENT

## I.  LEGAL STANDARD

Dismissal under Rule 12(b)(6) is only appropriate when a complaint does not give the defendant fair notice of a legally cognizable claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a 12(b)(6), a complaint need only

contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement' but it asks for more than sheer possibility that a defendant acted unlawfully." *Id.* at 678. To determine whether a complaint possesses the requisite measure of specificity, courts must take all factual allegations as true and construe all reasonable inferences in the light most favorable to the plaintiff. *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

## II.     THIS COURT IS THE APPROPRIATE FORUM FOR RESOLVING PLAINTIFF'S CLAIMS.

Before turning to their Rule 12(b)(6) arguments, Defendants first (mistakenly) contend that this Court is an improper forum for resolving Dupee's claims because (i) the Court lacks personal jurisdiction over each of the Defendants, and (ii) the Terms of Service that supposedly apply mandate that any disputes be ligated in Tel Aviv, Israel. Both arguments fail.

### A.     The Court has Personal Jurisdiction Over Defendants, Which are Responsible for the Operation and Maintenance of *Slotomania*.

First, the Court has personal jurisdiction over both Defendants. "[U]nder Ohio law, a court may exercise personal jurisdiction over a non-resident defendant" for any of the reasons enumerated in Ohio's long-arm statute. *Conn v. Zakharov*, 667 F.3d 705, 718 (6th Cir.2012); R.C. 2307.382(A). In particular,

> "a court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's (i) [t]ransacting any business in this state; (2) [c]ontracting to supply services or goods in this state;…(4) [c]ausing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this state…(6) [c]ausing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state; (7) [c]ausing tortious injury to any person by a criminal act,

any element of which takes place in this state, which he commits or in the commission of which he is guilty of complicity…."

R.C. 2307.382(A); *see also Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 75 (1990) (emphasis in original) (holding that the long-arm statute "permit[s] jurisdiction over nonresident defendants who are *transacting any* business in Ohio.") (emphasis in original). In the face of a motion to dismiss pursuant to Rule 12(b)(2), a "plaintiff need only make a prima facie showing of jurisdiction," *Kinder v. City of Myrtle Beach*, No. 11-cv-712, 2015 WL 1439136, at *1 (S.D. Ohio Mar. 27, 2015), and a court reviewing such a motion must "construe the facts in the light most favorable to the nonmoving party." *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014).

Here, there should be no question that the Court has personal jurisdiction over both Defendants, as they transact business within this State, contract for the sale of goods (i.e., Coins) within this State, regularly solicit and do business within this State for profit, and knowingly injured individuals (such as Plaintiff) within this State. R.C. 2307.382(A). For his part, Plaintiff specifically alleges that "Defendants conduct business in this District, and…the wrongful conduct [at issue] occurred in this District." (Compl. ¶ 9.) Plaintiff further alleges that he is an Ohio resident, that he began playing *Slotomania* on his personal computer located in Ohio, where he continuously purchased and wagered Coins in the online casino game. (*Id.* ¶¶ 5, 33–34.) In other words, because Defendants reached into the state of Ohio to transact business with Plaintiff, Plaintiff was injured in Ohio as a result, and those injuries arise directly from Defendants' supplying him goods (i.e., Coins) in Ohio, the long-arm statute clearly brings them within the jurisdiction of this Court. *Kinder*, 2015 WL 1439136, at *1; *see also Projects Unlimited, Inc. v. All Tech Electronics, Inc.*, No. 09-cv-284, 2010 WL 299156, at *4 (S.D. Ohio

Jan. 21, 2010) (finding personal jurisdiction where a company garnered sales from Ohio through an interactive website).

Notwithstanding, Defendants argue that the Court does not have personal jurisdiction over them because they "do not operate *Slotomania*" and instead, that it is non-party Playtika Israel that is responsible for the conduct at issue. (Mot. at 9.) Setting aside that position contradicts Plaintiff's express allegations (which must be accepted as true at this point), Defendants' arguments in this regard are belied by their own public representations. *See* Caesars Acquisition Company 10-k ("CAC 10-k"), available at http://investor.caesarsacquisitioncompany.com/secfiling.cfm?filingID=1575879-15-9&CIK=1575879.)[3] For example, as represented in its 10-k filings, Caesars owns the *Slotomania* "brand[] and associated trademarks, copyrights, logos, software code, audio-visual elements, graphics, original music, story lines, interfaces, technology and trade secrets that [Caesars] uses to develop and offer games on multiple platforms." (CAC 10-k at 10.) The 10-k also explains (in detail) how Caesars profits directly from its operation, facilitation, and control of the game. (*See, e.g.,* CAC 10-k at 5 ("[Caesars'] current portfolio of games includes *Slotomania*[.]"), 6 ("*Slotomania*, [Caesars'] free-to-play social slot-style game…"), 27 ("*Slotomania* accounted for 51% of [Caesars'] social and mobile online game revenue for 2014 and 47.7% of [Caesars'] total revenue for 2014. [Caesars'] growth depends on its ability to increase interest in its key established game, *Slotomania*, by continually enhancing the game."), 33 ("[Caesars'] also owns the *Slotomania* brand.").) Similarly, Playtika SM represents its control, operation, and facilitation of Playtika SM in its own online presence. *See, e.g.,* Playtika Santa Monica LinkedIn, *available*

---

[3] In ruling on a motion to dismiss, this Court is able to consider any document incorporated by, or referred to in, the pleadings. *See Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 889 (N.D. Ohio 2010). Caesars Acquisition Company's annual 10-k report is referred to on page 7 of the Complaint to demonstrate the revenues generated by *Slotomania* in 2014. (Compl. ¶ 21.) As a result, it may be considered.

*at* https://www.linkedin.com/ company/buffalo-studios (last visited Sept. 1, 2015) (listing *Slotomania* as a Playtika SM product.) Thus, the idea that Defendants have no control over or ownership of the *Slotomania* game must be rejected.

In light of the foregoing, it is clear that Defendants have more than sufficient contacts with the state of Ohio to subject them to personal jurisdiction in this Court and therefore, their request for dismissal pursuant to Rule 12(b)(2) should be denied.

**B.      Playtika Israel's Terms of Service Do Not Apply and Cannot Be Considered.**

Next, Defendants argue that even if the Court did have personal jurisdiction over them, non-party Playtika Israel's Terms of Service (the "Terms") require the dismissal of Dupee's action and the re-filing of any subsequent action in the courts of Tel Aviv, Israel, under Israeli law. That argument fails as well.

      *i.      The Playtika Israel Terms are outside of the Pleadings and may not be Considered.*

"As a general rule, when considering a 12(b)(6) motion to dismiss, matters outside the pleadings may not be considered by the court." *Metz v. Unizan Bank*, 05-cv-1510, 2007 WL 3232431, \*1 (N.D. Ohio Oct. 31, 2007). As a limited exception, documents attached to a motion to dismiss may be considered if "they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999) *abrogated on other grounds Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). Documents outside the pleadings, however, cannot be considered where the opposing party "question[s] the[ir] substantive validity, accuracy, or completeness…." *Floyd v. Bank of Am., N.A.*, No. 13-cv-2072, 2014 WL 3732591, at \*3 (N.D. Ohio July 25, 2014) (citing *Robins v. Global Fitness Holdings, LLC*, 838 F.Supp.2d 631, 642 (N.D. Ohio 2012)).

Here, Plaintiff never relies on or references the supposed Playtika Israel Terms. (*See generally* Compl.) In fact, he does not reference any terms at all, nor does he identify Playtika Israel. (*See id.*) And because Plaintiff brought the action against Caesars and Playtika SM, the Terms—which are allegedly "between [non-party] Playtika Ltd., an Israeli company, and Plaintiff[,]"—are not relevant, let alone central, to Dupee's claims. (Mot. at 9); *see also Jackson*, 194 F.3d at 745; *Asp v. Toshiba Am. Consumer Products, LLC*, 616 F. Supp. 2d 721, 724 (S.D. Ohio 2008) (finding a warranty central to a plaintiff's claims where it was referred to numerous times in the Complaint and central to plaintiff's breach of warranty claim). Further still, the authenticity of the Terms is squarely in dispute: Defendants have offered no evidence showing that the Terms were published or in effect at the time Dupee played *Slotomania*, nor that he ever agreed to them. The only information Plaintiff can even garner from the Terms is that they were copyrighted in 2015, which means that they just as easily could have come into existence after Plaintiff stopped playing *Slotomania* (in April 2015). (Dkt. 10-2 at 7.) In any event, there is no clear answer at this point.

ii.      *Enforcement of the Terms' Israel Forum Selection Clause would Unfairly Prejudice Plaintiff and the Class.*

Moreover, even if the Terms did apply here, the Israel forum selection clause that Defendants rely upon would so unfairly prejudice Dupee and other consumers that it could not be enforced. "The language of [a] forum selection clause determines its scope." *C. Thorrez Industries, Inc. v. LuK Transmissions Systems, LLC*, No. 09-cv-01986, 2010 WL 1434326, at *3 (N.D. Ohio Apr. 8, 2010). The scope of such a clause depends "upon the intention of the parties reflected in the wording of particular clauses and the facts of each case," *id.* at *5, and "[t]he Court must examine the substance of [p]laintiff's claims as they relate to the precise language of the forum selection clause." *Traton News, LLC v. Traton Corp.*, 914 F.Supp.2d 901, 908 (S.D.

Ohio 2012) *aff'd in part,* 528 Fed.Appx. 525 (6th Cir. 2013). To determine whether a forum selection clause should be enforced, courts look to two factors applicable here: "[i] whether the designated forum would ineffectively or unfairly handle the suit; and [ii] whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust." *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009).

As an initial matter, the actual phrasing of the forum-selection clause requires that any disputes between consumers and *Playtika Israel*[4] be decided in Tel Aviv, Israel. (Dkt. 10-2 at 7.) Had Playtika wanted to extend the scope of the Terms to include its parent company, Caesars, and Playtika SM, it would have had to expressly do so. *See C. Thorrez Industries, Inc.,* 2010 WL 1434326, at *3. Obviously it did not.

In any event, both of the relevant factors weigh against application of the forum selection clause. First, Israeli law would not offer Dupee a valid cause of action against either of the Defendants, or Playtika Israel, were he to re-file there.[5] Furthermore, requiring Plaintiff and other users to file their claims in Israeli courts would be so inconvenient as to be unjust. *Wong* 589 F.3d at 828. Israel has no actual relationship to the dispute, only to non-party Playtika Israel. Defendants operate out of Nevada (their principal place of business) and offer *Slotomania* to consumers in Ohio (and across the country) from Nevada. (Compl. ¶¶ 6–7, 9, 67.) Documents, witnesses, and communications related to the ownership, development, and operation of *Slotomania* would therefore be located in Nevada. Additionally, litigating in Israel would

---

[4]    Setting aside that the Terms cannot be considered, Defendants also have not shown that they have any right to invoke them. *See City of Akron v. Castle Aviation Inc.*, No. 16057, 1993 WL 191966, *2 (Ohio Ct. App. June 9, 1993). They have not presented any evidence to suggest that they are parties to the Terms, and the Terms themselves make clear that they are not. They have not shown that they are assignees of Playtika Israel's obligations and interests under the Terms. And they have not shown that they are third-party beneficiaries of the Terms. But even if they had, that would also suggest that they may be held liable for the harm caused to Plaintiff and the class, thus negating their bid for dismissal. *Lyman Steel Corp. v. Ferrostaal Metals Corp.*, 747 F.Supp. 389, 398 (N.D. Ohio 1990) (discussing how a wholly owned subsidiary's actions may bind a parent to the jurisdiction of the court.).

[5]    Upon an investigation of Israeli law and communicating with Israeli attorneys, Plaintiff's counsel were unable to discover any claims that Dupee could bring in order to obtain the relief already requested in this matter.

effectively deprive Plaintiff and the Class of any right to recovery, as they all live within the United States—to pursue litigation in Israel would mean (at the very least) travel overseas, securing Israeli counsel, being subject to discovery overseas and a host of other difficulties (not the least of which are increased time and expense) that would not otherwise be present if Plaintiff were allowed to proceed in the United States. Effectively, those additional burdens would prohibit (or strongly discourage) Plaintiff and any other consumer from seeking relief for Defendants' conduct. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (acknowledging that damages of even "a few hundred dollars[,]" in light of the costs and burden of litigation prevent most plaintiffs from bringing suit). Accordingly, because enforcement of the clause would serve to preclude Plaintiff's day in court, it should not be enforced.

> iii. *If the Court is inclined to Consider the Playtika Israel Terms, Plaintiff Should be Granted Leave to Take Limited Discovery Regarding their Applicability to his Claims, and Defendants' and Playtika Israel's Respective Involvement in the Maintenance and Operation of Slotomania prior to a ruling on Defendants' Motion.*

In the event that the Court is inclined to consider the Playtika Israel Terms (it should not), Dupee should be granted leave to conduct limited discovery related to the Terms—e.g., discovery related to when the supposed Terms were published and went into effect—as well as the role each Defendant and Playtika Israel played in the conduct giving rise to Dupee's claims.

District courts have the discretion to "permit discovery [that] would aid in resolution of the motion; or []conduct an evidentiary hearing." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 (6th Cir. 2005) (citing *Serras v. First Tenn. Bank Nat'l Ass'n.*, 875 F.2d 1212, 1214 (6th Cir. 1989)). Though the decision is discretionary, *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 434 (6th Cir. 2006), and the "plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional

discovery unless the plaintiff's claim is 'clearly frivolous.'" *Carr v. DJO Inc.*, No. 12-cv-42, 2012 WL 3257666, at *3 (S.D. Ohio Aug. 8, 2012) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)).

Here, granting Dupee the ability to conduct limited discovery would aid in the resolution of Defendants' 12(b)(2) and forum selection arguments. The entirety of their arguments are premised upon the contention that Playtika Israel, not Defendants, operated *Slotomania*, and thus this Court lacks personal jurisdiction over Defendants and must enforce the forum selection clause within the Terms. (Mot. at 8–10.) As discussed at length above, Plaintiff contests that assertion based upon, *inter alia*, Defendants' own public statements. *See* Section II (A) *supra*; *see also Lemkin v. Bell's Precision Grinding*, No. 08-cv-789, 2009 WL 1542731, at *2 (S.D. Ohio June 2, 2009) (permitting plaintiff limited discovery where defendant challenged personal jurisdiction and attached an affidavit disputing contacts with forum state). Allowing Dupee to conduct limited jurisdictional discovery would aid in the Court's determination as to whether (i) the Terms supplied by Defendants actually apply to Dupee's claims, and (ii) the actual level of involvement and control each Defendants exercises over *Slotomania*. *See Victoria's Secret Stores Brand Mgmt., Inc. v. Bob's Stores LLC*, No. 13-cv-1261, 2014 WL 1045994, at *2 (S.D. Ohio Mar. 17, 2014) (ordering limited discovery to resolve dispute between parties as to whether defendant's website sufficiently subjected it to personal jurisdiction). Thus, discovery would clarify the relationship between the Defendants and third-party Playtika Israel, as well as the issue of applicability of the Terms (if any) to the instant dispute. *See Carr*, 2012 WL 3257666, at *3. The alternative—sending Plaintiff to Israel to pursue his claims without certainty as to those issues—would be far more costly and unfair.

Accordingly and in light of the factual dispute between the Parties regarding personal jurisdiction over the Defendants, the Court, in its discretion, should allow Dupee to conduct the limited discovery necessary to resolve those issues and Defendants' motion. *See Victoria's Secret Stores Brand Mgmt., Inc.*, 2014 WL 1045994, at *2.

### III. PLAINTIFF PROPERLY PLED CLAIMS FOR VIOLATION OF THE NDTPA, VIOLATION OF THE OLRS, AND UNJUST ENRICHMENT.

In addition to their (mistaken) contention that this action should proceed in Israel, Defendants next argue that Plaintiff has failed to sufficiently plead each of his causes of action. Defendants are wrong.

#### A. Plaintiff States a Valid Claim Under the NDTPA.

Defendants first argue that Plaintiff's claims under the NDTPA must fail because (i) Plaintiff—a citizen of Ohio—cannot bring claims under the Nevada statute, (ii) choice of law principles prevent Plaintiff from recovering under the laws of Nevada, and (iii) Defendants were not responsible for the conduct alleged. Each is taken in turn below.

##### i. Plaintiff Properly Brings His Claim Pursuant to Nevada Law.

As an initial matter, Dupee may bring a claim under the NDTPA as a citizen of Ohio. "[A]n action may be brought [under Nevada law] by *any person* who is a victim of consumer fraud, including those subjected to deceptive trade practices under the NDPTA." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 226 (S.D.N.Y. 2012) (quoting N.R.S. 41.600(1)) (emphasis in original). There is no requirement that a plaintiff be a Nevada citizen to bring claims under the NDPTA. Plaintiff need only allege "(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff," in order to state a private claim for damages under the NDTPA. *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009). Dupee does just that. He alleges that (1) Defendants operated an interactive game system (*Slotomania*)

without the proper state licenses, and (2) the operation of *Slotomania* caused (3) Plaintiff and members of the Class to lose money they wagered in the unlicensed game. (Compl. ¶¶ 44–50.) Nothing more need be pleaded. *See Goldberg v. Cent. Credit Mgmt., Inc.*, No. 11-cv-00305, 2012 WL 6042194, at *4 (D. Nev. Dec. 3, 2012) (finding that a claim under the NDPTA would have been adequately pleaded by plaintiff's allegations that (1) defendant's conduct was required to be licensed in Nevada, (2) defendants' conduct was not licensed, and (3) that plaintiff suffered resulting damages).

Defendants nevertheless argue that the NDTPA cannot apply extraterritorially, relying on a single case, *Risinger v. SOC LLC*, 936 F. Supp. 2d 1235 (D. Nev. 2013). That reliance is misplaced. In *Risinger,* the court's opinion was issued in the context of a *different* statute and the legislature's explicit limitation of that statute to workers *in Nevada*. *Id*. at 1250 ("The legislative declaration that opens the [statute] states that the 'Legislature hereby finds and declares that the health and welfare of workers and the employment of persons in private enterprise *in this State* are of concern to the State. . . .'" (citation omitted)). And contrary to Defendants' contention, the Nevada courts have allowed NDTPA claims to proceed between an out-of-state plaintiff and out-of-state defendants for conduct occurring in Nevada. *See Phillips v. Dignified Transition Solutions, LLC, et al.*, No. 13-cv-02237, Dkt. 36 at 5–6 (D. Nev. Aug. 24, 2014) (allowing claim to proceed between Texas plaintiff and Delaware corporate defendants for conduct occurring in Nevada). As such, the Court should find that the NDTPA, like the deceptive trade practice statutes of other states, does not preclude Dupee from pursuing his cause of action.[6]

---

[6]      It is notable, that the deceptive trade practices statutes of other states—which have the same goals as the NDTPA here—have been applied under similar circumstances. *See e.g., Johnson v. Triple Leaf Tea Inc.*, No. 14–cv–01570, 2014 WL 4744506, at *7 (N.D. Cal. Sept. 23, 2014) (applying California's unfair competition law extraterritorially where defendant was a California corporation with its principal place of business in California); *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 187 (2005) (recognizing the extraterritorial application of the Illinois Consumer Fraud Act); *Peterson v. Graoch Assoc. No. 111 Ltd. Partnership*, No. 11-cv-5069, 2012 WL 254264, *3 (W.D. Wash. Jan. 26, 2012) (finding extraterritorial application of Washington consumer protection act

      ii.    *The Most Significant Relationship Test Requires Application of Nevada Law.*

Ohio choice of law principles also support application of the NDTPA. In such circumstances, the Ohio courts apply the "most significant relationship" test to determine which jurisdiction's law controls. *See Mulch Mfg., Inc. v. Advanced Polymer Solutions, LLC*, 947 F.Supp.2d 841, 854 (S.D. Ohio 2013) (applying the most significant relationship test to a deceptive trade practices suit).[7] The factors considered by the Court to determine which jurisidiction has the most significant relationship are:

> [(1) T]he place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of the Restatement (Second) of the Conflict of Laws] which the court may deem relevant to the litigation.

*Hale v. Enerco Grp., Inc.*, 288 F.R.D. 139, 143 (N.D. Ohio 2012). Further, the relevant Restatement factors include "the relevant policies of the forum state; the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied." *Id.* at 144.

Here, although Dupee is an Ohio citizen and suffered his injury in Ohio, all other relevant factors weigh in favor of applying Nevada law. That is, the conduct that led to his and the Class's injury—e.g., the consumer fraud that resulted from Defendants' operation of an illegal gambling

---

and state securities act proper, in part, because "public policy favors the application of Washington law to ensure that Washington corporate entities behave responsibly.").

[7]     Of course, before the choice of law analysis is undertaken, a conflict must actually exist between the laws in question. *See Irondale Indus. Contractors, Inc. v. Virginia Sur. Co.*, 754 F. Supp. 2d 927, 931 (N.D. Ohio 2010). Here, Ohio law does not offer a viable alternative claim to Dupee's NDTPA claim. As such, the application of the laws of either state would result in distinct outcomes, and a conflict exists. *See MV Circuit Design, Inc. v. Omnicell, Inc.*, No. 14-cv-2028, 2015 WL 1321743, at *12 (N.D. Ohio Mar. 24, 2015) (recognizing an actual conflict where Ohio did not offer a cognizable claim available under the laws of another jurisdiction).

enterprise without the proper licensing—occurred in Nevada. (Compl. ¶¶ 1, 6–7, 28, 45–50.)

Defendants' principal places of business are located in Nevada. (*Id* ¶¶ 6–7.) Nevada is where

Defendants maintain, update, expand upon, control, and accept the profits from *Slotomania*—all

in violation of the NDTPA. (*Id*. ¶¶ 6–7, 20–21, 28, 45–50); (CAC 10-k at 10, 27 (discussing

Caesars' marketing, upkeep, and maintenance of *Slotomania* as well as the necessity of

"maintain[ing] [*Slotomania*'s] popularity").) And, Nevada has a clear interest in regulating,

licensing, and taxing the companies that reside and operate gambling operations within the state,

an interest Ohio cannot claim. *See, e.g.*, *Sacco v. State*, 105 Nev. 844, 847 (1989) ("[B]ecause

licensed gaming is indispensable to Nevada's economy, [the Supreme Court of Nevada]

believe[s] that the legislature proscribed unlicensed gaming because it represents a serious threat

to the state's economic base."); *Brown v. Eddie World, Inc.*, 348 P.3d 1002, 1003 (Nev. 2015)

("[T]he gaming industry is essential to Nevada's economy and welfare, and its success depends

on "strict regulation[.]") (quoting Wiltsie v. Baby Grand Corp., 105 Nev. 291, 293 (1989)).

Furthermore, the application of the NDTPA to Dupee and the putative Class's claims would

ensure a nationwide uniformity of results that Ohio law, offering no alternative claim for pure

statutory violations alone or the failure to obtain proper gambling licenses, cannot. As such,

Plaintiff may bring his claims for deceptive trade practices under the NDTPA.

      *iii.*     *Defendants' Operation of Slotomania Violates the NDTPA.*

Having demonstrated that Nevada law should apply to Defendants' conduct at issue,

Plaintiff further sufficiently alleges a claim for Defendants' violations of the NDTPA. Under the

NDTPA, a person engages in a "'deceptive trade practice' when in the course of his or her

business or occupation he or she knowingly . . . [c]onducts [] business . . . without all required

state, county or city licenses[,]" or "[v]iolates a state or federal statute or regulation relating to

the sale or lease of goods or services." N.R.S. 598.0923. Defendants' operation of *Slotomania* without the required licensing violates both of these prongs.

        a.      Defendants' Operation of *Slotomania* Constitutes "Interactive Gaming."

First, Nevada law mandates that gambling operations such as Defendants' maintain "all federal, state, county and municipal gaming licenses as required by statute, regulation or ordinance or by the governing board of any unincorporated town" in order to "operate, carry on, conduct, maintain or expose for play in or from the State of Nevada any interactive gaming system…." N.R.S. 463.160(1)(f). The statute's regulation of "interactive gaming" governs a person's operation of "gambling games through the use of communications technology that allows a person, utilizing . . . electronic transfers of money, credit cards, debit cards, or any other instrumentality, to transmit to a computer information to assist in the placing of a bet or wager and corresponding information related to the display of the game, game outcomes or other similar information." N.R.S. 463.016425(1).

The Nevada Gaming Commission and State Gaming Control Board have further defined an "interactive gaming system" as "a gaming device," which includes the "collective hardware, software, communications technology, and proprietary hardware and software specifically designed or modified for, and intended for use in, the conduct of interactive gaming." NV GAM REG 14.010(15). "The core components of an interactive gaming system, including servers and databases running the games on the interactive gaming system and storing game and interactive gaming account information, must be located in the State of Nevada except as otherwise permitted by the chairman or his designee." *Id.* In other words, an "interactive gaming system" requires (1) software (2) that is specially designed for interactive gaming, (3) and allows individuals to use "electronic transfers of money" (4) to transmit information related to the

placement of a bet or wager on a gambling game, (5) through telecommunications technology. *See* N.R.S. 463.016425(1); NV GAM REG 14.010(15).

Here, there should be no question that Plaintiff has sufficiently alleged that *Slotomania* is an "interactive gaming system." He alleges that *Slotomania* is a mobile application (i.e., software) that is specially designed for use as a slot machine on various devices (e.g., cellular phones, iPads and tablets, and computers). (Compl. ¶¶ 4, 21, 45–50); NV GAM REG 14.010(15). Next, *Slotomania* allows users to purchase Coins through the mobile application and on the Internet using a debit or credit card or other electronic funds (i.e., it allows users to transfer money electronically), and to use the Coins purchased for wagering within the slot machine (i.e., placement of a bet or wager). (Compl. ¶¶ 24, 26, 28–29.) And finally, *Slotomania* uses telecommunications technology to transmit information on all Coin purchases, wagers or bets, wins and losses for each player to Defendants' servers operating in Nevada. (Compl. ¶ 28.) Thus, *Slotomania* meets the statutory definition of an "interactive gaming system" in the context of "interactive gaming." *See* NV GAM REG 14.010(15); N.R.S. 463.016425.

And because the operation of *Slotomania* constitutes "interactive gaming," Defendants' failure to "procure[]" and "maintain[] . . . all federal, state, county and municipal gaming licenses as required by statute, regulation or ordinance[,]" as required by N.R.S. 463.160 constitutes a violation of the NDTPA under both prongs alleged by Dupee. (*See* Compl. ¶ 45); N.R.S. 463.160; N.R.S. 598.0923 (1), (3); *see also Del Webb Communities, Inc. v. Partington*, No. 08-cv-00571, 2009 WL 3053709, at *9 (D. Nev. Sept. 18, 2009) (finding that a defendant engaged in a deceptive trade practice as defined by N.R.S. 41.600 by "knowingly conducting their . . . business without the required license" pursuant to N.R.S. 598.0923).

b. *Slotomania* is a "Gambling Game."

Notwithstanding the fact that Plaintiff sufficiently alleges a violation of the NDTPA, Defendants still argue that "*Slotomania* is not an 'interactive gaming system' within the meaning of the statute because it is not a 'gambling game.'" (Mot. at 13.) That argument also fails.

A "gambling game" is defined as:

[A]ny game played with cards, dice, equipment or any mechanical, electromechanical or electronic device or machine for money, proper, checks, credit or any representative of value, including, without limitation the generality of…slot machine…but does not include games played with cards in private homes or residences in which no person makes money for operating the game, except as a player, or games operated by charitable or educational organizations which are approved by the Board….

N.R.S. 463.0152. There can be no question that *Slotomania* constitutes a gambling game. Not only *is it a slot machine* (which is expressly identified in the statute), but it is also a game "played with…equipment…or electronic device or machine…for…money….credit or any representative of value." *Id.* Indeed, upon wagering Coins in the *slot machine*, consumers can receive "credit" in the form of additional Coins that will advance gameplay or can be exchanged for "money" through the secondary market by selling their accounts. (Compl. ¶ 28–30, 32.) The Coins won are also "representative of value"— they are purchased by individuals who wish to play *Slotomania* and have a direct value set by Defendants. (Compl. ¶ 2–3, 34 (describing the sale of Coins, by Defendants, for use in *Slotomania* at pre-set prices); *see also* (CAC 10-k at 31 (describing Caesars' control of its in game economies (such as in *Slotomania*) for purposes of regulating the value of their in game goods (such as Coins).)

As such, Defendants sole substantive argument against *Slotomania* being considered an interactive gaming system fails.[8]

---

[8]     The only other argument Defendants raise in response to Plaintiff's NDTPA claims is that they did not "operate, carry on, conduct, maintain or expose for play *Slotomania*[.]" (Mot. at 13.) But as discussed in Section II,

**B.** **Plaintiff Has Stated a Valid Claim Under the Ohio Loss Recovery Statute.**

In addition to violating the gambling laws of Nevada, Defendants' conduct also violates the laws of Ohio, which provide Dupee the right to recover his losses. Defendants, however, contend that Plaintiff's claim fails because (i) *Slotomania* is not an unlawful game of chance under Ohio law, and (ii) Plaintiff does not meet the "heightened pleading" required by the OLRS. Those arguments likewise miss their mark.[9]

*i.* *Plaintiff Sufficiently Pleads the Elements of His OLRS Claim.*

First, Plaintiff adequately pleads a claim for relief under Ohio's Gambling Loss Recovery Statute. Section 3763.01 of the OLRS provides a private right of action to recover gambling losses under Section 3763.02 if the defendant operates an illegal game of chance pursuant to Section 2915.01. *See* R.C. 3763.01(B). An illegal game of chance is one that includes "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance…." *see* R.C. 2915.02(D), and is operated for profit. *See also* R.C. 2915.01(E) ("'Game of chance conducted for profit' means any game of chance designed to produce income for the person who conducts or operates the game of chance[.]"). A "[g]ame of chance" includes any "game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance[.]" R.C. 2915.01(D); *see also State v. Brown*, 116 Ohio App.3d 389, 392 (2nd Dist. 1996).

Once a plaintiff has established that the game at issue is an illegal game of chance, he can bring a claim to recover his losses pursuant to Section 3763.02, which provides, in relevant part:

---

*supra,* Defendants are the appropriate parties here and cannot seriously disclaim their involvement in the alleged conduct at issue.

[9] Defendants argue that Plaintiff has no standing to bring a claim based upon *Slotomania*'s status as a slot machine pursuant to R.C. § 3772.01. (Mot. at 16.) While this is true, *Slotomania*'s status as an illegal game of chance pursuant to R.C. § 2915.02 presents a valid basis for Dupee's claim under the OLRS. Defendants recognize as much by arguing against any alleged violation of R.C. § 2915.02. (Mot. at 16–24.) As discussed in further detail below, Plaintiff has sufficiently alleged the illegality of Defendants' conduct pursuant to R.C. § 2915.02, and therefore, has also alleged his right to recover his losses through the OLRS.

20

> If a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit.

R.C. 3763.02. The OLRS, allows recovery for losses that occurred playing a "game of chance" from the winner thereof.

Here, Dupee (a person) alleges that he played "*Slotomania*" (an illegal game based entirely on chance) in which he bet and lost (wager and loss) Coins (things of value) that he purchased (using money) from Defendants (pay or deliver, or a part thereof). *See* R.C. 3763.02; (Compl. ¶¶ 33-34 (alleging that Plaintiff "play[ed] *Slotomania* by wagering purchased coins for the chance of winning additional coins.").) Accordingly, his claim under the OLRS should stand. Despite this simple application of the alleged facts to the law, Defendants argue (i) that *Slotomania* is not an unlawful game of chance, (ii) that Plaintiff did not lose and Defendants did win anything as contemplated by the statute, and (iii) that Plaintiff has failed to plead with sufficient specificity his and the Class's losses. Each of these arguments fails too.

a.      *Slotomania* is an Unlawful Game of Chance.

First, Defendants argue that *Slotomania* is not a game of chance because it does not require payment to play and does not involve the requisite "chance." Defendants are wrong. To sufficiently plead a claim for the illegal operation of a "game of chance," a player must (1) give something of value, (2) in the hope of gain, and (3) the outcome must be determined largely or wholly by chance." *Ohio Vending Oper. Group v. Dept. of Liquor Control*, No. 87AP-64, 1987 WL 15672, *1 (Ohio Ct. App. Aug. 13, 1987); *see also* [.]" R.C. 2915.01(F)(3)–(4) ("gambling device," includes any "slot machine" or other "equipment, device, apparatus, or paraphernalia specially designed for gambling purposes.). *Slotomania* is a "gambling device," specifically a

"slot machine" because it is a "video, or digital device that is capable of accepting anything of value, directly or indirectly, from or on behalf of a player who gives the thing of value [i] in the hope of gain" or (ii) in order to "conduct . . . [a] game of chance." R.C. 2915.01(QQ)(a)–(b). Here, and as explained below, Dupee has alleged that *Slotomania* is a digital application that (i) accepts a thing of value ("Coins") from its players (ii) in the hope that their wager will award them more Coins, and (iii) in order to conduct a game of chance. (Compl. ¶¶ 1, 21, 25–29.)

        1.     Plaintiff and the Putative Class Gave Something of Value
             to Play *Slotomania*.

No matter how the Coins are considered, they are something of value. They have literal value in the sense that Defendants sell them for a specified amount—i.e., $1.99 to $49.99, depending on how many Coins are purchased (Compl. ¶¶ 2, 24)—and have value according to the "relative ease of securing an equivalent good[,]" such as more Coins, "via non-paid means within the game[,]" such as winning. (CAC 10-k at 31.) They also have inherent value because the Coins provide users credit to continue game play and provide additional amusement, which courts have regularly found to be something of value. (*See* Compl. ¶ 23 (Defendants make clear that Coins are required to "keep the fun going" on *Slotomania*); *see also Stillmaker v. Dep't of Liquor Control*, 18 Ohio St. 2d 200, 204 (1969) (finding a game to be a "gambling device per se" where the "prize" was "added amusement without additional cost."); *Brown*, 116 Ohio App. 3d at 393 ("[W]here added amusement is subject to be procured by chance without the payment of additional consideration therefor, there is involved in the game the elements of gambling, namely, price, chance and a prize."). And finally, they have value because the Coins won may be sold on the secondary market for actual currency. (Compl. ¶ 32 ("[F]or consumers that win big, they cash out by selling their coin-laden accounts on the secondary market.").)

Nevertheless, Defendants contend that *Slotomania* is "entirely free to play."[10] While individuals occasionally receive free Coins, the game is un questionably operated *for profit* (CAC 10-k at 27) and, in any event, the individuals on whose behalf Plaintiff brings these claims "lost purchased Coins by wagering at Defendants' *Slotomania*," not just free Coins. (Compl. ¶ 35 (defining the Class as "All persons in the United States who lost *purchased* Coins by wagering at Defendants' *Slotomania*" and the Subclass as "All Class members [i.e., people who lost *purchased* Coins] in the State of Ohio.") (emphasis added)); *see also Bedford v. Doerner,* 2013-Ohio-1798, ¶ 6 (Ohio App. Ct. May 2, 2013) ("[T]he justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme[.]").

As such, *Slotomania* satisfies the first requirement to be an illegal game of chance.

### 2. *Slotomania* Players Have a Hope of Gain.

Next, Plaintiff and the Class wagered their Coins in hopes of gaining something else—namely additional Coins, extended gameplay, and the ability to "cash out" their accounts when they completed play. (Compl. ¶¶ 29–30, 32); *see also Ohio Vending Oper.*, 1987 WL 15672, at *3; *Westerhaus Co. v. City of Cincinnati*, 165 Ohio St. 327, 327 (1956) (the right to additional play upon attaining a sufficient score represents the *prize* necessary to constitute gambling). Defendants argue that "enabling play of the game" is not something a consumer can hope to gain because the game is free to play and the Coins won "can never be redeemed or 'cashed out' for anything of value." (Mot. at 18.) That is also wrong.

---

[10] Defendants argue that *Slotomania* cannot be considered an illegal game of chance because it is "free-to-play" and it "offers tens of thousands of 'free Coins to users[,]'" and therefore no user is ever required to give anything of value to play it. (Mot. at 17.) This argument, however, ignores the Complaint's allegations that users purchase Coins for the *purpose of wagering them* in order to win more Coins. (Compl. ¶¶ 23–24.) As such, the wagering of Coins—whether they were purchased by or given to consumers—constitutes the consideration required by Ohio law. *See Stillmaker*, 18 Ohio St.2d at 204 (additional playing time, absent any other monetary exchange for additional play constitutes consideration). By contrast, Defendants' reading of the law would allow land-based casinos and other similar institutions to avoid liability by offering free chips to players on a daily basis while still allowing them to purchase, and wager, additional chips after exhausting a free daily allotment. Such an absurd result is obviously not contemplated by the law.

First, all of the Class members purchased and wagered the Coins at issue, so the argument that *Slotomania* is free to play is a red herring. Next, Defendants' own cited authority stands for the proposition that—like in this case—"hoping to gain a free game or reply…even [if] not fulfilled, is sufficient to meet the second requirement of R.C. 2915.01(D)." *Id.* at *3; *see also Brown*, 116 Ohio App.3d at 393 (finding that "winning additional playing time on [] video slot machines without paying additional money" satisfies the hope of gain requirement); *Stillmaker*, 18 Ohio St.2d at 204 (finding that free plays—or "added amusement without additional cost"—constitute a hope of gain, and a game of chance that awarded these free plays was a gambling device *per se*); *Kraus v. City of Cleveland*, 135 Ohio St. 43, 46 (1939) ("Since amusement has value, and added amusement has additional value, and since it is subject to be procured by chance without the payment of additional consideration therefor, there is involved in the game three elements of gambling, namely, chance, price and a prize."); *Myers v. City of Cincinnati*, 128 Ohio St. 235, 237 (1934) (recognizing that games which award "additional amusement by continuing operation of the machine, are gambling devices.").[11] And finally, Plaintiff and the Class purchased and wagered Coins in the "hopes of gaining" more Coins, which they could ultimately sell on the secondary market for real currency. (Compl. ¶ 3.)

Accordingly, the "hope of gain" requirement is satisfied as well.

3. *Slotomania* is a "Game of Chance."

Finally, Defendants make the half-hearted argument that *Slotomania* does not involve the requisite "chance" for gambling because "there is no chance involved in connection with the user's purchase." (Mot. at 17.) That argument misses the point.

---

[11] Again, it bears noting that Defendants' argument that the Coins have no value because they are sometimes awarded for free is nonsensical. (Mot. at 19) ("Receiving more of something that was already free and will be free again…is not 'gain' within the meaning of Ohio law.") That's especially true given that by their own admissions, Defendants stand to gain—and have gained—exceptional profit from the sale of the Coins. (Compl. ¶ 21); (*see also* CAC 10-k at 31 (discussing the need to regulate the value of virtual goods, such as Coins).)

In analyzing whether a game is "one of chance," courts consider whether the "outcome *of the game itself*—not the outcome of a person's purchase of credits—is "determined largely or wholly by chance." *Ohio Vending Oper.*, 1987 WL 15672, at *3. Here, there can be no question that the outcome of a player's wager on *Slotomania* turns entirely on chance, as once an individual presses the "SPIN!" button to operate the slot machine, "*Slotomania* does not allow (or call for) any additional user action. Instead, the consumer's computer or mobile device communicates with and sends information… to Defendants' servers…[which] then execute the game's algorithms to determine the game's outcome." (Compl. ¶ 28.) The algorithms alone, then, dictate the outcome of the game, and Plaintiff and the putative Class members did not—and indeed, could not—do anything to increase their chances of winning. (*Id.*); *see also Brown*, 116 Ohio App. 3d at 391, 393–94 (finding a machine that operated solely on the push of a button, had no skill involved in determining the outcome, to be a "game of chance" under R.C. 2915.01). Indeed, Defendants even recognize that the outcome of the wager "turns on chance" when they state that, "although the outcome of the *Slotomania* game itself *turns on chance*, there is no chance involved in the connection with the user's purchase."[12] (Mot. at 17 (emphasis added).)

Thus, *Slotomania* satisfies this final requirement necessary to constitute an illegal game of chance under Ohio law.

### ii. *Defendants Stand to Win and Plaintiff and the Class Stand to Lose.*

Once it is established that Defendants have maintained and operated an unlawful game of chance, Section 3763.02 requires that the plaintiff has "los[t] to another" and paid or delivered

---

[12] In arguing that *Slotomania* does not involve the requisite chance, Defendants mistakenly argue that the purchase of the Coins itself needs to be determined by chance. (Mot. at 17.) That's wrong. Indeed, the preceding sentence in Defendant's motion explains "that the outcome of the player's *wager* [must] be determined largely or wholly by chance." (Mot. at 17.) Thus, it is the wager—not the purchase—that requires chance.

the money lost "to the winner thereof." R.C. 3763.02. Here, Plaintiff and the putative Class clearly lost—and Defendants undoubtedly won—the wagers made after purchasing Coins.

Plaintiff repeatedly alleges that he and the putative Class members lost money after they purchased Coins—ranging in value from $1.99 to $49.99 (Compl. ¶¶ 2, 24)—and wagered them in Defendants' game of chance. (*Id.* ¶ 34.) Dupee himself alleges that he purchased Coins, wagered them, and ultimately lost *more than $12,000* in actual currency by playing *Slotomania*. (*Id.*) Defendants, conversely, won the money lost by Plaintiff and the putative Class. (*Id.*) Indeed, Defendants won every time Plaintiff and the putative Class members wagered and lost their Coins—both in the sense that they profited from the sale of the Coins that were lost, and stood to profit from the sale of the Coins that Plaintiff and the putative Class members would have to purchase to continue playing the game. (*Id.* ¶¶ 2–3, 23–24.)

Despite this clear application of "losers" and "winners" under the statute, Defendants nevertheless argue that Plaintiff cannot be a "loser" because there was nothing he could have won, and that they can never be "winners" because they never stand to lose anything.[13] That argument fails. Every time Plaintiff and the putative Class purchased and wagered Coins, they ran the risk of either (i) winning additional Coins that could be converted into additional plays or exchanged on the secondary market for cash, or (ii) losing their wagers—which they paid for— in their entirety upon *Slotomania's* chance algorithms. (Compl. ¶ 28.)[14] Put a different way,

---

[13]   Defendants further argue that their ability to "confiscate the 'Coins' or terminate the user's account at any time" renders "[a]ny 'gain,' [into] nothing more than the revocable privilege of playing the game for the entertainment of the user." (Mot. at 19.) But that is no different than any other instance of illegal gambling, wherein the operator may refuse to honor any debts they owe to a player at their whim without the fear of legal repercussion from the player. *See* R.C. 3763.01 (making void any agreement based upon a gambling debt). The fact that the secondary market has flourished also contradicts Defendants' position in this regard—if there were really no value in the Coins, no market would exist for them.

[14]   Here, Defendants again attempt to limit their liability by raising the inapplicable third-party contract they have attached to their motion to dismiss. (Mot. at 22, 24.) As discussed above, the Court should not refer to the document in rendering its decision. *See* Section II *supra*. Regardless of the provision attempting to prohibit the resale of Coins, however, the continued sale of accounts still assigns an inherent value to them. Further, there is no

26

*Slotomania* operates in the same way a brick-and-mortar casino accepts cash from players in exchange for chips at the beginning of their gambling session. Thereafter, if the player wagers and wins additional chips, they may continue to play and wager them again. If they lose all of their chips, they must pay cash to obtain more in order to continue playing (and wagering). Alternatively, the player could simply walk away from the table and "cash out" their chips for real currency. Certainly, Defendants would not argue that there are no winners and losers at their brick-and-mortar casinos.

Likewise, every time Dupee or another user played *Slotomania*, Defendants ran the risk of either (i) paying out additional Coins—thereby limiting their sales of Coins and the profit associated with those sales—or (ii) winning the players' Coins—thereby causing players to purchase more Coins for continued play. (Compl. ¶¶ 28–30.) Again, there was no situation in which the outcome of the game would pose no loss or reward for the Defendants. Defendants, of course know this, as Caesars expressly assigns value to the consumption of Coins through *Slotomania* in its 10-K filings, and therefore shows that it risks the loss of income every time a player wins. (CAC 10-k at 80 (associating Caesars' measure of revenue with the consumption, and purchase of in game currencies); 31 (identifying that the "ease of securing an equivalent good [such as Coins] via non-paid means [such as winning] within the game" affects the revenue realized by Caesars).)[15]

---

requirement that Plaintiff allege that he attempted to sell or buy Coins on the secondary market in order for such a value to attach and to sufficiently state a claim for relief. Ultimately Defendants' argument is akin to that tried (and rejected) in the criminal context where a defendant posted signs identifying the illegal games of chance as 'not for gambling use' or for 'amusement only' in hopes of masking its liability. *See e.g. City of Columbus v. Gutter*, No. 80AP-925, 1981 WL 3058, at *2 (Ohio Ct. App. Mar. 12, 1981) ("no gambling" sign failed to preclude criminal liability); *McDougal v. State,* 324 Ark. 354, 359 (1996) (finding the posting of "No Gambling" signs to be a hollow gesture). The argument should meet a similar fate here.

[15]     Such valuations are common in the mobile-app gaming industry. (*See* Churchill Downs Form 10-k at 50, available at http://ir.churchilldownsincorporated.com/secfiling.cfm?filingID=20212-15-11 (identifying that revenue generated from the sale of virtual goods is recorded as deferred revenue and recognized over the estimated average

Thus, in every spin of the wheel, Dupee and Defendants each stood to gain or lose, putting the conduct squarely within the purview of Ohio's illegal gambling laws. *See Brown*, 116 Ohio App.3d at 393 (finding illegal gambling had occurred where a player wagered money against a game's operator simply for the chance to win additional amusement).[16]

> iii.     *Dupee Alleged His and the Class's Losses with the Requisite Specificity.*

Defendants level one final argument at Plaintiff's OLRS allegations, contending that he failed to "plead the losers and amount of their losses with specificity." (Mot. at 24.) But, to properly state a claim under the OLRS, a plaintiff who seeks to recover for losses directly incurred "need only allege that the defendant is indebted to the plaintiff for, or received to the plaintiff's use, the money so lost and paid, or converted the goods won of the plaintiff to the defendant's use, whereby the plaintiff's action accrued to him[.]" R.C. 3763.03. In other words, the statute requires a plaintiff to plead that they lost money or a thing of value, to the defendant, and paid the defendant such money or thing of value, within six months of filing their complaint. *Id*. Plaintiff does just that. He specifically alleges that he lost more than $12,000 to Defendants between June 2014 and April 2015 as a result of his wagers in *Slotomania*. (Compl. ¶ 34.)

---

life of the virtual good in question, for casino games this "average life" is four days until the goods purchases are consumed); (CAC 10-k at 80 (acknowledging the realization of revenue from Coin sales occurs at consumption).

[16]     Defendants' citations to the contrary do not require a different result. Aside from failing to address the gambling laws of Ohio, each case deals with a situation where a lawsuit was filed against a website administrator and payment service that, as Defendants admit, were not actually a party to any wagers. (Mot. at 21–22); *see Humphrey v. Viacom, Inc.*, No. 06-cv-2768, 2007 WL 1797648, at *9 (D.N.J. June 2, 2007) (finding that a third-party fantasy sports operator—who merely administered the league and provided pre-determined winnings *based on contracted amounts*—was not a winner because, among other things, it was not a participant in the league); *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL 5567587, at *6 (N.D. Ill. Oct. 9, 2013) (finding that a fantasy sports operator—who merely collected commission and was not part of any bet itself—was not liable for illegal gambling because it merely created a forum where users could compete *against each other*); *Sonnenberg v. Oldford Group, Ltd.*, 2015 WL 1379505, *6 (S.D. Ill. Mar. 24, 2015) (finding defendants not liable because they were "more akin to a third party service provider that provided a forum for *others to play games* and did *not have a [direct] stake in how the games were decided/won*"); *Farhner v. Tiltware LLC*, No. 13-cv-0227, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015) (same); *Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 924 (Ill. App. Ct. 5th Dist. 2010) (finding that a third-party credit card company was not a "winner" under an Illinois statute because any profit stemmed from a purchase that occurred prior to, and was not affected by the outcome of, the gambling). Distinguishable here, Defendants (i) were direct participants in every spin of *Slotomania*, (ii) automatically wagered with each individual for *every* spin of the wheel, and (iii) won or lost as a direct result of the outcomes of those wagers. (Compl. ¶¶ 4, 26–28, 30, 34, 63–66.)

Defendants nevertheless argue that Plaintiff must identify every individual who lost money, how much they lost, and when they lost it. (Mot. at 24–25) (citing *Salamon v. Taft Broadcasting Co.*, 16 Ohio App.3d 336 (1st Dist.1984) (dealing with claims brought on behalf of a third party under R.C. 3763.04). That argument is confused. To be clear, Plaintiff is only seeking to recover *his own* gambling losses, not to recover the losses of some third-party under Section R.C. 3763.04—as is clear from the face of the Complaint, Plaintiff has not alleged such a third-party claim. The fact that he brings this case as a putative class action does not change that. Indeed, although Plaintiff seeks to represent the interests of the putative Class members, claims brought on behalf of the Class (if successful) would result in the Class members recovering *their own losses* under R.C. 3763.02, not Plaintiff recovering the Class members' losses for himself. (Compl. ¶ 68.) Accordingly, no more specific allegations or demonstration of proof for each Class member—who have yet to be identified—is required on his part, and he has sufficiently pleaded his OLRS claim.[17]

### C.     Plaintiff Sufficiently Pleaded His Claim for Unjust Enrichment.

Lastly, Defendants argue that Dupee's claim for unjust enrichment must fail because (i) again, *Slotomania* is supposedly not an unlawful game of chance under Ohio law, and (ii) Dupee received the Coins that he purchased. Once again, those arguments lack merit.

To properly plead a claim for unjust enrichment under Ohio law, a plaintiff must allege that (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant had knowledge of the benefit conferred; and (3) the defendant retained the benefit under circumstances that would render it unjust to do so without payment. *See Hambleton v. R.G.*

---

[17]     To follow Defendants' baseless interpretation of the OLRS would be to allow "[D]efendants . . . to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits." *Butler*, 727 F.3d at 801. The likely result of prohibiting Plaintiff's claims on a classwide basis would not be millions of individual claims for restitution of monies wrongly lost to Defendants, but rather no claims at all. *Id.*

29

*Barry Corp.*, 12 Ohio St. 3d 179 (1984); *San Allen v. Buehrer,* No. 99786, 2014–Ohio–2071, ¶ 114 ("The purpose of an unjust enrichment claim is to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it."). Unjust enrichment arises out of an implied contract and offers a theory of recovery absent a written contract governing the relationship between the parties. *Patel v. Dish Network L.L.C.*, No. 12-cv-1078, 2015 WL 4776894, at *4 (S.D. Ohio Aug. 12, 2015).

Here, Plaintiff alleges that he and the Class conferred upon Defendants a benefit in the form of the money they (i) paid to purchase Coins for wager in *Slotomania*, and (ii) the value of the Coins wagered, and lost, in *Slotomania*. (Compl. ¶¶ 53, 55–56.) He further alleges that Defendants received that benefit in the form of the purchase price and gambling losses (to the tune of millions of dollars) and have knowledge of it. (*Id.* ¶¶ 33–34, 54–55); (*see also* CAC 10-k at 27 ("*Slotomania* accounted for 51% of [Caesar's] social and mobile online gaming revenue for 2014 and 47.7% of [its] total revenue for 2014.").) Finally, he alleges that it would be unjust for Defendants to retain that money as they have obtained it through their unlawful maintenance and operation of *Slotomania*. (Compl. ¶ 56); *see also Schaste Metals, Inc. v. Tech Heating & Air Conditioning, Inc.*, No. 71589, 1997 WL 449989, *3 (Ohio Ct. App. Aug. 7, 1997) ("[N]o person ought to retain a benefit which, if retained by him, would result in inequity and injustice.").[18]

Accordingly, Plaintiff has stated a valid claim for unjust enrichment.

---

[18]    Defendants argue that the doctrine of 'unclean hands' precludes Dupee from recovering under a theory of unjust enrichment. (Mot. at 27.) However, Plaintiff Dupee was wholly unaware of the illegality of Defendants' conduct. (Compl. ¶ 19 ("[T]housands of consumers [like Dupee]have lost millions of dollars unwittingly playing Defendants' unlawful games of chance.").) Though knowingly violating the law may dirty the hands of a party, Plaintiff, and the class's, unwitting participation in Defendants illegal game of chance should not prevent him from finding relief in equity. *See Wiley v. Wiley*, 2007-Ohio-6423, ¶ 15 (Ohio Ct. App. Dec. 3, 2007) ("Thus, for the doctrine of unclean hands to apply, the offending conduct must constitute reprehensible, grossly inequitable, or unconscionable conduct, rather than mere negligence, ignorance, or inappropriateness."); *see also State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235, 244 (1998) (providing that a *knowing* violation of the law may foil a request for equitable relief); *State ex rel. Commt. for the Referendum of Lorain Ordinance No. 77-01 v. Lorain Cty. Bd. of Elections*, 2002-Ohio-4194 ¶ 39 (2002) (same).

## CONCLUSION

For the foregoing reasons, Plaintiff Robert Dupee, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order (i) denying Defendants' motion to dismiss in its entirety, (ii) requiring Defendants to answer Plaintiff's Class Action Complaint and Jury Demand, and (iii) providing such other and further relief as the Court deems reasonable and just.

<div style="margin-left: 40%">

Respectfully Submitted,

**ROBERT DUPEE**, individually and on behalf of all others similarly situated,

</div>

Dated: September 8, 2015                    By:  /s/ Benjamin H. Richman
<div style="margin-left: 45%">One of Plaintiff's Attorneys</div>

<div style="margin-left: 45%">

Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney C. Booth
cbooth@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Jason R. Bristol (0072989)
jbristol@crklaw.com
Joshua B. Fuchs (0087066)
jfuchs@crklaw.com
Joshua R. Cohen (0032368)
jcohen@crklaw.com
The Hoyt Block Building – Suite 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
Tel: 216.781.7956
Fax: 216.781.8061

</div>

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION

The undersigned certifies that this matter has not yet been assigned to a track, and that this Memorandum complies with the thirty-page limit allowed by the Complex Track as previously requested, without opposition, by Defendants, and previously granted to Defendants by this Court's June 12, 2015 order.

/s/ Benjamin H. Richman

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2015, I caused to be served the above and foregoing document by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system, on this the 8th day of September, 2015.

/s/ Benjamin H. Richman